Slip Op. 22-43

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TAIZHOU UNITED IMP. & EXP. CO. LTD., | |
| Plaintiff, | |
| and | |
| GUANGZHOU JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD., JANGHO GROUP CO., LTD., BEIJING JIANGHEYUAN HOLDING CO., LTD., BEIJING JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD., JANGHO CURTAIN WALL HONG KONG LTD., SHANGHAI JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD., | Before: Leo M. Gordon, Judge |
| Consolidated Plaintiffs, | Consol. Court No. 16-00009 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | |
| Defendant-Intervenor. | |

**OPINION**

[Commerce's <u>Final Results</u> sustained.]

Dated: May 10, 2022

<u>Douglas J. Heffner</u> and <u>Richard P. Ferrin</u>, Drinker Biddle & Reath LLP of Washington, DC, for Plaintiff Taizhou United Imp. & Exp. Co. Ltd.

        J. Kevin Horgan, Alexandra H. Salzman, Gregory S. Menegaz, and John Joseph Kenkel, deKieffer & Horgan, PLLC of Washington, DC, for Consolidated Plaintiffs Guangzhou Jangho Curtain Wall System Engineering Co., Ltd., Jangho Group Co., Ltd., Beijing Jiangheyuan Holding Co., Ltd., Beijing Jangho Curtain Wall System Engineering Co., Ltd., Jangho Curtain Wall Hong Kong Ltd. and Shanghai Jangho Curtain Wall System Engineering Co., Ltd.[1]

        Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades Jr., Assistant Director.  Of counsel on the brief was Kirrin Hough, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

        Alan H. Price, Robert E. DeFrancesco, III, and Elizabeth S. Lee, Wiley Rein LLP of Washington, DC, for Defendant-Intervenors Aluminum Extrusions Fair Trade Committee.

        Gordon, Judge: This action involves the final results of the 2013 administrative review conducted by the U.S. Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on aluminum extrusions from the People's Republic of China ("PRC").  See Aluminum Extrusions from the People's Republic of China, 80 Fed. Reg. 77,325 (Dep't of Commerce Dec. 14, 2015) (final results admin. rev.) ("Final Results"); see also accompanying Issues and Decision Memorandum, C-570-968 (Dep't of Commerce Dec. 7, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-31425-1.pdf                  ("Decision

---

[1] In July 2020, approximately three months after the conclusion of briefing the USCIT Rule 56.2 motion for judgment on the agency record, Jangho replaced their former counsel at Sandler, Travis & Rosenberg, PA with their current counsel.  See ECF No. 96 (Form 12 Substitution of Attorney filed by J. Kevin Horgan to appear in place of Kristen S. Smith).

Memorandum"); <u>Aluminum Extrusions from the People's Republic of China</u>, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) ("<u>CVD Order</u>").

     The court presumes familiarity with the history of this action.  <u>See</u> <u>Taizhou United Imp. & Exp. Co. v. United States</u>, 46 CIT ___, 2022 WL 500665 (Feb. 18, 2022) ("<u>Taizhou II</u>"); <u>Taizhou United Imp. & Exp. Co. v. United States</u>, 44 CIT ___, 475 F. Supp. 3d 1305 (2020) ("<u>Taizhou I</u>"); <u>see also</u> <u>Shenyang Yuanda Aluminum Eng'g Co. v. United States</u>, 41 CIT ___, 279 F. Supp. 3d 1209 (2017), <u>aff'd</u>, 918 F.3d 1355 (Fed. Cir. 2019) (affirming Commerce's determination that curtain wall units imported under contract for entire curtain wall are subject to <u>CVD Order</u>); <u>Shenyang Yuanda Aluminum Industry Eng'g Co. v. United States</u>, 38 CIT ___, 961 F. Supp. 2d 1291 (2014), <u>aff'd</u>, 776 F.3d 1351, 1358 (Fed. Cir. 2015) (affirming Commerce's determination that parts of curtain wall units are subject to the <u>CVD Order</u>); <u>Antidumping Duty and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China</u> (Dep't of Commerce Mar. 27, 2014) (final scope ruling on curtain wall units produced and imported as part of contract to supply curtain wall), <u>available at</u> https://enforcement.trade.gov/download/prc-ae/scope/38-curtain-wall-units-7apr14.pdf.

     In <u>Taizhou I</u>, the court sustained the <u>Final Results</u> as to almost all the issues raised by Plaintiffs; however, the court remanded Commerce's determinations to countervail subsidized purchases of glass and aluminum extrusions for further explanation and reconsideration.  <u>Id.</u>  "Because the court remand[ed] Commerce's determination that it may countervail glass and aluminum extrusions as inputs to the subject merchandise ….

the court d[id] not reach Plaintiffs' alternative arguments as to whether Commerce reasonably found that the statutory requirements of § 1677(5) were met with respect to Plaintiffs' aluminum extrusion and glass purchases." See Taizhou I, 44 CIT at ___, 475 F. Supp. 3d at 1311.  On remand, Commerce clarified and further explained why its determinations to countervail subsidized purchases of glass and aluminum extrusions were reasonable and in accordance with law, and the court sustained Commerce's remand results.  See Taizhou II, 46 CIT ___, 2022 WL 500665.

Accordingly, what remains before the court[2] are Plaintiffs' challenges to Commerce's application of the statutory requirements in finding that there were countervailable subsidies on glass and aluminum extrusions in the Final Results. Specifically, Plaintiffs challenge Commerce's finding that the suppliers of the glass and aluminum extrusions at issue constitute governmental "authorities" under 19 U.S.C. § 1677(5)(B),[3] as well as Commerce's findings that the provision of glass and aluminum extrusions for less than adequate remuneration ("LTAR") constituted "specific" subsidies as defined under 19 U.S.C. § 1677(5A)(D)(iii).  See Consolidated PIs.' Mem. in Supp. of its Mot. for J. on the Agency R. at 28–38, ECF No. 82-1 ("Jangho Br."); see also Def.'s

---

[2] Upon consideration of Plaintiffs' motion for rehearing, see ECF No. 122, the court vacated a judgment it entered after Taizhou II to allow it to consider Plaintiffs' remaining arguments.  See Order Vacating Judgment, ECF No. 129.

[3] As Commerce explained, "when a respondent purchases an input from a trading company or non-producing supplier, [Commerce will find that] a subsidy is conferred if the producer of the input is an 'authority' within the meaning of [§ 1677(5)(B)] and that the price paid by the respondent for the input was for LTAR."  See Decision Memorandum at 28, 34.

Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 25–35, ECF No. 88 ("Def.'s Resp.");
Def.-Intervenors' Resp. in Opp'n to Mots. for J. on the Agency R., ECF No. 89;
Consolidated Pls.' Reply Br., ECF No. 93 ("Jangho Reply").[4]   The court has jurisdiction
pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C.
§ 1516a(a)(2)(B)(iii)[5], and 28 U.S.C. § 1581(c) (2018).   For the reasons set forth below,
the court denies Plaintiffs' motions, sustains the <u>Final Results</u> as to these remaining
issues, and will enter judgment accordingly.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless
they are "unsupported by substantial evidence on the record, or otherwise not in
accordance with law."   19 U.S.C. § 1516a(b)(1)(B)(i).   More specifically, when reviewing
agency determinations, findings or conclusions for substantial evidence, the court
assesses whether the agency action is reasonable given the record as a whole.   <u>Nippon</u>
<u>Steel Corp. v. United States</u>, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).   Substantial
evidence has been described as "such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."   <u>DuPont Teijin Films USA v. United States</u>,
407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S.

---

[4] Plaintiff Taizhou United Imp. & Exp. Co. Ltd. ("Taizhou") joins and incorporates by
reference the arguments raised and briefed by Consolidated Plaintiffs Guangzhou Jangho
Curtain Wall System Engineering Co., Ltd., Jangho Group Co., Ltd., Beijing Jiangheyuan
Holding Co., Ltd., Beijing Jangho Curtain Wall System Engineering Co., Ltd., and
Shanghai Jangho Curtain Wall System Engineering Co., Ltd. (collectively, "Jangho").
[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of
Title 19 of the U.S. Code, 2018 edition.

197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2022).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

## II. Discussion

### A. Authorities

In its Post-Preliminary Analysis, Commerce determined "that the [Government of China ("GOC")] failed to cooperate by not acting to the best of its ability, and had withheld certain information with regard to all producers of primary aluminum, aluminum extrusions, and glass, and applied [facts available with an adverse inference ("AFA")], finding all producers to be 'authorities' within the meaning of [19 U.S.C. § 1677(5)(B)]."  See Decision Memorandum at 110.  In reaching its Final Results, Commerce continued to find that the application of AFA was warranted, and accordingly determined that the suppliers of aluminum extrusions and glass to Plaintiffs were "authorities" under

§ 1677(5)(B).  Id.  Plaintiffs challenge Commerce's application of AFA and its resulting

determination as unreasonable.  See Jangho Br. at 29; Jangho Reply at 11–14.

Specifically, Plaintiffs maintain that "the administrative record demonstrates that

both Jangho and the GOC fully cooperated with Commerce and responded to all requests

for information to the best of their ability, providing thousands of pages of information and

documentation."    Jangho Br. at 29.    Plaintiffs acknowledge that certain requested

information was not provided, but contend that "[w]here information was missing, the GOC

informed Commerce that it did not have the information or was not able to obtain it."  Id.

Plaintiffs also argue that it is "unreasonable to apply punitive AFA facts in this proceeding

to Jangho for information that the GOC did not possess or was unable to obtain."  Id.[6]

Commerce explained that to facilitate its analysis of whether producers of glass

and aluminum extrusions sold to respondents during the POR were "authorities" within

the meaning of § 1677(5)(B), it asked "the GOC to provide information regarding the

specific companies that produced [aluminum extrusions and glass] which the Jangho

Companies purchased during the POR."  See Decision Memorandum at 28, 34.  In both

the New Subsidy Allegation ("NSA") questionnaire and a supplemental questionnaire,

Commerce asked the GOC specific questions regarding the ownership and control of the

primary producers of aluminum extrusions and glass for Jangho during the period

---

[6] The court observes that these comments from Plaintiffs constitute the entirety of
Plaintiffs' argument in their USCIT Rule 56.2 motion challenging the reasonableness of
Commerce's finding that the suppliers of glass and aluminum extrusions were
"authorities" under § 1677(5)(B).

of review ("POR").  See id.  Commerce also asked the GOC to respond to the Input

Producers Appendix for each producer of the input purchased by respondent companies.

See id. at 28, 35.

Contrary to Plaintiffs' representation that "both Jangho and the GOC fully

cooperated with Commerce and responded to all requests for information to the best of

their ability," see Jangho Br. at 29, Commerce found that the GOC only provided partial

and incomplete information in response to these requests.  See Decision Memorandum

at 32, 38 ("[W]ith respect to the majority of the producers-suppliers identified by the

Jangho Companies, the GOC failed to provide the relevant Input Producer Appendix, and

further failed to request an extension for additional time to respond.  With respect to the

two producers-suppliers which the GOC identified as non-majority government-owned,

the GOC did not provide complete responses to our numerous requests for information,

including requests for information pertaining to ownership or control by CCP officials.").

The GOC maintained that it could not obtain the requested information from its local

offices responsible for collecting such information, and it was allegedly awaiting that

information, Commerce noted that the GOC never submitted any extension requests to

provide the requested information at a later time.  See id. at 32, 36.  With respect to the

two producers-suppliers of glass and aluminum extrusions for which the GOC did provide

some information, Commerce found that the GOC "did not provide key information

(e.g., business license(s), business group registration, tax registration certificate, and

annual reports) for the Department to perform an analysis to trace ownership of the

enterprises in question back to the ultimate individual owners." Id. at 31–32, 37–38. Commerce further determined that this missing information was necessary for its analysis under § 1677(5)(B) as to whether the producers-suppliers of Plaintiffs' glass and aluminum extrusions were "authorities." Id. ("The information we requested regarding the ultimate owners of the producers of the primary input(s) and the role of government/CCP officials and CCP committees in the management and operation of the input producers, which sold inputs to the respondents, is necessary to our determination of whether the producers are 'authorities.'").

As a result, Commerce concluded that, because this necessary information was not on the record, it "must rely on 'facts otherwise available' in reaching a determination in this respect." Id. at 32, 38. Commerce also found that an adverse inference was warranted in the application of facts available because "the GOC failed to cooperate by not acting to the best of its ability to comply with requests for information regarding the producers of [glass and aluminum extrusions] from which the Jangho Companies purchased during the POR because the GOC did not provide the requested information." Id. Ultimately, as AFA, Commerce determined that "all of the producers that produced the [glass and aluminum extrusions] purchased by the Jangho Companies during the POR are 'authorities' within the meaning of [§ 1677(5)(B)]." Id.

Commerce rejected the GOC's argument "that it does not play a role in any ordinary business operations, including those in which the state holds an ownership interest," noting that Commerce "provided the GOC an opportunity to provide requested

information to enable the Department's 'authorities' analysis under [§ 1677(5)(B)], which the GOC refused to do." Id. at 111.  Commerce explained that it had "previously concluded that producers in the PRC that are majority-owned by the government possess, exercise, or are vested with governmental authority." Id. Commerce elaborated that its "finding in this regard is based on the fact that record evidence indicates that the GOC exercises meaningful control over these entities and uses them to effectuate its goals of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector." Id.  In particular, Commerce noted that it "also disagree[d] with the GOC that it has cooperated to the best of its ability," highlighting that Commerce "provided the GOC multiple opportunities to provide the requested information, which, as discussed above, was relevant and necessary to the Department's 'authorities' analysis under [§ 1677(5)(B)]." Id. at 112.

Commerce further found that "[t]he limited information that was provided by the GOC was not sufficient, in light of the remaining missing information." Id.  Commerce observed that "by stating that the information is not relevant, the GOC has placed itself in the position of the Department; however, it is the prerogative of the Department, not the GOC to determine what information is relevant to our proceedings." Id.  Therefore, Commerce determined that with respect to the "authorities" analysis, "the request for such information was necessary and warranted, and the GOC's failure to provide such information rendered the application of AFA appropriate." Id.  Commerce also emphasized that "the GOC's attempted justification for failing to provide all of the

requested information on the basis that its own local offices failed to respond simply demonstrates an unwillingness to provide information in this review." Id.  Commerce further noted that "claims about the number of producers and suppliers and the burden of responding fully with regard to all producers is an insufficient explanation, given that the GOC failed to provide any producer appendices responses on its first opportunity, and failed to provide a single complete producer appendix response, and provided only five incomplete producer appendix responses." Id.

Given Commerce's analysis and explanation, the court cannot agree that the record supports Plaintiffs' contention that "both Jangho and the GOC fully cooperated with Commerce and responded to all requests for information to the best of their ability." See Jangho Br. at 29.  To the contrary, while Plaintiffs highlight the information that GOC did provide in response to Commerce's requests, Plaintiffs' argument ignores the significant gap in the record left by the GOC's failure to act to the best of its ability to provide all the information requested by Commerce.  Accordingly, the court sustains as reasonable Commerce's finding that the application of AFA was warranted as well as Commerce's determination that all the producers that produced the glass and aluminum extrusions purchased by Plaintiffs during the POR are "authorities" within the meaning of § 1677(5)(B).

## B. Benefit & Specificity[7]

Before Commerce may countervail a subsidy, it must find that the subsidy at issue

is specific in law or fact as provided under 19 U.S.C. § 1677(5A)(D).  The statute provides

that a subsidy may be "specific as a matter of fact" if "[t]he actual recipients of the subsidy,

whether considered on an enterprise or industry basis, are limited in number."  See

19 U.S.C. § 1677(5A)(D)(iii)(I).   Here, Commerce, relying on facts available with an

adverse inference, found that the aluminum extrusions for LTAR program was specific,

noting that "the GOC did not provide a list of industries which purchase these inputs or

provide the quantity and value purchased by each industry, withheld the information, and

failed to explain why it had withheld the information."  See Decision Memorandum at 116.

"With respect to glass for LTAR, [Commerce] relied on the information available to find

the program specific under [§ 1677(5A)(D)(iii)(I)] because the GOC did not provide a list

of industries which purchase these inputs or provide the quantity and value purchased by

---

[7] While Plaintiffs maintain that "The Administrative Record Does not Support a Finding of Benefit or Specificity," it appears that Plaintiffs' argument focuses solely on Commerce's specificity analysis under § 1677(5A)(D).  See Jangho Br. at 29.  Given that Plaintiffs develop no argument challenging Commerce's "Benefit" analysis under § 1677(5)(E), the court concludes that any challenge by Plaintiffs to Commerce's finding of a "Benefit" is waived.  See Home Prods. Int'l, Inc. v. United States, 36 CIT 33, 37, 810 F. Supp. 2d 1373, 1378–79 (2012); MTZ Polyfilms, Ltd. v. United States, 33 CIT 1575, 1578, 659 F. Supp. 2d 1303, 1308–09 (2009); Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1078, 638 F. Supp. 2d 1325, 1350 (2009); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").  Accordingly, this section of the opinion solely addresses Plaintiffs' challenge to Commerce's findings of specificity under § 1677(5A)(D).

each industry.   Therefore, [Commerce] based [its] analysis on the industries identified by the GOC and Petitioner, finding that the industries identified were limited and the glass for LTAR program specific."  Id.

Plaintiffs challenge the reasonableness of Commerce's determinations under § 1677(5A)(D)(iii)(I) that the recipients of the aluminum extrusions and glass for LTAR were "limited in number."  See Jangho Br. at 29–37 (maintaining that "the administrative record in this proceeding demonstrates that no benefit was provided to a specific industry or group of industries, and that both glass and aluminum extrusions are widely consumed in China," and listing a wide variety of products produced in China containing aluminum extrusions and glass); see also Jangho Reply at 14–16[8].

With respect to glass, Plaintiffs contend that the GOC's NSA Questionnaire response, along with the language of the CVD Order, "demonstrate that glass serves various applications and industries," and that it is unreasonable for Commerce to find that the provision of glass for LTAR was "limited" where the record shows that "glass is widely

---

[8] In their reply, Plaintiffs state that "the record evidence in this administrative review shows that the primary aluminum, aluminum extrusions and glass at LTAR are not specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) as these inputs are used too broadly."  See Jangho Reply at 16 (emphasis added).  However, Plaintiffs' motion for judgment on the agency record focused on Commerce's determinations as to aluminum extrusions and glass, and made no reference to Commerce's determination with respect to primary aluminum.  See generally Jangho Br.  Accordingly, the court concludes that Plaintiffs have waived any argument with respect to Commerce's determination as to primary aluminum.  See United States v. Ford Motor Co., 463 F.3d 1267, 1276–77 (Fed. Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before this court." (citing Novosteel SA v. United States, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002) ("a party waives arguments based on what [does not] appear[ ] in its brief")).

consumed in China."  See Jangho Br. at 30–31 (citing GOC's NSA Questionnaire Response at 10–11, PR[9] 276, CR 132 ("NSA Response")).  Plaintiffs make similar arguments regarding Commerce's determination as to the specificity of aluminum extrusions for LTAR.  See id. at 31–37 ("Similar to glass, and unlawfully, Commerce ignored record evidence demonstrating that [aluminum extrusions are] widely available in China.").

### 1. Glass

To determine which industries use glass, Commerce asked the GOC to provide a list of industries in China that purchased glass directly and to provide the amounts (volume and value) purchased by each of those industries.  See Decision Memorandum at 63.  The GOC responded that "[t]here are a vast number of uses for either tempered plate glass or laminated glass[,] [and] [t]he types of consumers that may purchase either tempered plate glass or laminated glass are highly varied within the economy…."  See id. (quoting NSA Response at 8).  The GOC further stated that "it is commonly known that tempered glass, and to some extent also laminated glass, are used in a variety of downstream sectors, including but not limited to doors and windows building, construction model forging, curtain wall, internal decoration, furniture and ancillaries, television, air-conditioning, refrigerator, toaster, oven, electronics, watch, mobile phone, musical

---

[9] "PR ___" refers to a document contained in the public administrative record, which is found in ECF No. 29-2 unless otherwise noted.  "CR ___" refers to a document contained in the confidential administrative record, which is found in ECF No. 29-3 unless otherwise noted.

players, cars and land transportation vehicles, home instrument, among others." Id. (quoting NSA Response at 10–11). However, Commerce observed that "the GOC provided none of the information requested concerning amounts purchased by individual industries, stating that 'to the best of the GOC's knowledge, neither tempered plate glass nor laminated glass producers compile their sales volume and value by the industry in which the mandatory respondent companies operate, as well as the totals purchased by every other industry.'" Id.

Commerce noted that the petitioner's new subsidy allegation "provided information demonstrating that users of tempered and laminate glass are limited to a number of enterprises and industries (e.g., construction and automobile)." Id. Commerce found that while the GOC identified several "uses" for glass, it had not "not classified these 'uses' into industries or otherwise identified the industries which cover these various uses." Id. Commerce further found that an analysis of the types of end uses described by the GOC "would imply the existence of at least four industries." Id. Given the GOC's failure to provide data supporting its claim that "there are vast 'uses' of glass" and its contention that it is "common knowledge that glass is 'used in a variety of downstream sectors[,]'" Commerce found that the "GOC's claims lack evidentiary value, as they are based on the GOC's opinions or on what the GOC claims is common knowledge, and not on any express or specific evidence." Id. Accordingly, Commerce, "taking into consideration the information provided by Petitioner and the GOC," determined that the "recipients of glass

are limited in number to at least two and possibly four industries, and that the provision

of glass is therefore de facto specific within the meaning of [§ 1677(5A)(D)(iii)(I)]."  Id.

Plaintiffs' arguments here echo those raised by the GOC in the underlying

proceeding.  While Plaintiffs highlight the wide variety of "uses" of glass, Plaintiffs do not

engage with Commerce's analysis of the record nor its resulting finding that "recipients of

glass are limited in number to at least two and possibly four industries."  See Decision

Memorandum at 63; cf. Jangho Br. at 30–31.  Plaintiffs maintain that Commerce's finding

of specificity is unreasonable in light of Commerce's prior determination in Chlorinated

Isocyanurates from the People's Republic of China, 79 Fed. Reg. 56,560 (Dep't of

Commerce Sept. 22, 2014) ("Chlorinated Isocyanurates"), in which Commerce found an

alleged urea LTAR program not to be specific because there were nine separate

industries that consumed urea.  See Jangho Br. at 37; see also Decision Memorandum

at 118.  Plaintiffs, however, again fail to engage with Commerce's explanation for why

Chlorinated Isocyanurates was distinguishable and inapplicable here.   Commerce

explained that the "GOC has provided no verifiable[] evidence, and indeed no evidence,

of any industries consuming glass."  Decision Memorandum at 118.  Commerce further

noted that even in the hypothetical circumstance where there was "verifiable information

on the record indicating that the GOC's list of purported users of glass was accurate, that

list would not reflect the diversity of users which were found to consume urea in

Chlorinated Isocyanurates from the PRC."   Id.   Commerce also highlighted that "the

GOC's assertion and argument [did not] attempt [to] address the issue of whether the

construction industy is a predominant or disproportionate user of glass."  Id.  Having

failed to engage with the merits of the analysis of Commerce's challenged determination,

Plaintiffs are unable to demonstrate that Commerce acted unreasonably in finding the

provision of glass for LTAR to be specific under § 1677(5A)(D)(iii)(I).

### 2. Aluminum Extrusions

As for aluminum extrusions, Commerce similarly asked the GOC to provide a list

of industries that purchased aluminum extrusions directly and to provide the amounts

(volume and value) purchased by each of the industries.  See Decision Memorandum

at 32.  In response, the GOC again failed to provide the requested information; instead,

the GOC responded that "[t]here are a vast number of uses for aluminum extrusions," and

that the "type of consumers that may purchase aluminum extrusions is highly varied within

the economy."  See id. (quoting NSA Response at 4).  The GOC further stated that "[a]s

the Department is aware, aluminum extrusions are used in a variety of downstream

sectors, as evidenced by the comprehensive coverage and large number of HTS codes

and the wide variety of scope rulings with respect to the subject merchandise of this

proceeding."  Id. at 32–33.

Commerce observed that information placed on the record by petitioner regarding

aluminum extrusions "identified three consuming industries[:] transportation, machinery,

and equipment."  Id. at 117.  Commerce requested additional detail on this issue from the

GOC in its Third Supplemental Questionnaire, noting that "the GOC claimed in [two other

proceedings covering solar cells] that there were six industries that consumed aluminum

extrusions in 2012: construction industry, transportation industry, mechanical and electrical equipment industry, consumer durable goods industry, electricity, and other industries." Id. at 33, 117.  While the "GOC endorsed that information, it claimed it was unable to provide updated information for the POR 'in this timeframe of this NSA investigation,' without explaining why it was not able to do so in the allotted timeframe or what efforts it made to collect the information." Id. at 33 (citing GOC Third Supplemental Questionnaire Response at 66 and 67, PR 317).   Commerce further noted that "[u]ltimately, the GOC provided none of the information requested concerning amounts of aluminum extrusions purchased by individual industries." Id.

Commerce found that it must rely on "facts available" as "necessary information is not available on the record" due to the GOC's failure to cooperate and refusal to act to the best of its ability to comply with Commerce's request for information. Id. Consequently, Commerce found that an adverse inference was warranted, and in applying AFA, Commerce found that the "GOC's provision of aluminum extrusions is specific within the meaning of [§ 1677(5A)(D)(iii)(I)]." Id.  Commerce explained that it "found the program to be specific based on AFA because the GOC declined to provide a list of industries on the record of this review, despite evidence that they had done so in the past.  Further the GOC's contention that it lacked sufficient time to do so, within the deadline of our supplemental questionnaire, is insufficient.  Our AFA determination merely noted that evidence available on the record indicates no more than the existence of three industries according to Petitioner and the GOC's endorsement of six U.S. industries,

including the construction industry, that supported the determination in <u>Crystalline Silicon</u>

<u>Photovoltaic Cells</u>."  <u>Id.</u> at 117.

Plaintiffs maintain that Commerce's application of AFA here effectively "ignore[d]

evidence on the record that demonstrates that aluminum extrusions are widely available."

Jangho Br. at 31.  Plaintiffs reiterate the wide variety of products in which aluminum

extrusions may be found, arguing that Commerce's scope rulings as to these products

"demonstrate that extrusions are used in a virtually innumerable variety of industries."  <u>Id.</u>

at 32–37.  Plaintiffs' contentions lack merit.  As Commerce explained, "the various scope

rulings or the scope of the <u>Orders</u> do not indicate a precise number or list of consuming

industries different from the sets of three or six indicated on the record."  <u>See</u> <u>Decision</u>

<u>Memorandum</u> at 117.  Commerce noted that while the GOC had "pointed to the large

number of products which are within the scope of the order, the GOC has not suggested

these products fall under additional industries not considered."  <u>Id.</u>  Plaintiffs' recitation

of the various scope rulings and products containing aluminum extrusions does not

engage with Commerce's determination that it "cannot base its analysis on information

which the GOC failed to place on the record."  <u>Id.</u>  In reaching its determination,

Commerce emphasized that "the GOC has not provided the quantity and

value  ofaluminum extrusions consumed by the three to six industries identified on the

record, or any other industries."  <u>Id.</u>

Plaintiffs again suggest that Commerce's finding of specificity as to the provision

of aluminum extrusions in this proceeding is inconsistent with Commerce's negative

Consol. Court No. 16-00009                                             Page 20

finding in <u>Chlorinated Isocyanurates</u>.   As explained above, Plaintiffs' argument fails to address the distinctions between this proceeding and Commerce's findings in <u>Chlorinated Isocyanurates</u> regarding the wide variety of industries consuming the subsidized input.   <u>See</u> <u>Decision Memorandum</u> at 118 (distinguishing record in <u>Chlorinated Isocyanurates</u> with GOC's failure to provide verifiable evidence on record). Plaintiffs' reliance on <u>Chlorinated Isocyanurates</u> is also misplaced because Commerce relied on AFA to reach its specificity finding as to aluminum extrusions for LTAR here, whereas Commerce did not have to resort to AFA in <u>Chlorinated Isocyanurates</u> in finding no specificity regarding urea for LTAR.   <u>See</u> <u>Decision Memorandum</u> at 118.

Overall, the court cannot agree with Plaintiffs that Commerce acted unreasonably in determining that the GOC failed to act to the best of its ability and withheld necessary information on the record.   Accordingly, the court sustains Commerce's decision to apply AFA, and its subsequent determination that the industries consuming aluminum extrusions are limited and that the aluminum extrusions for LTAR program is "specific" under § 1677(5A)(D)(iii)(I).

### III. Conclusion

For the foregoing reasons, the court denies Plaintiffs' remaining challenges to the <u>Final Results</u>.  Judgment will be entered accordingly.


                                               /s/ Leo M. Gordon
                                              Judge Leo M. Gordon

Dated: May 10, 2022
        New York, New York